Farrelly *v.* Pittsburgh, Appellant, et al.

Farrelly *v.* Pittsburgh (Duquesne Light Co., Aplnt., et al.).

Argued December 4, 1940.   Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN and PATTERSON, JJ.

*Bennett Rodgers,* Assistant City Solicitor, with him *Wm. Alvah Stewart,* City Solicitor, for appellant, Nos. 16 and 17.

*T. W. Pomeroy, Jr.,* with him *Reed, Smith, Shaw & McClay,* for appellant, Nos. 217 and 30.

*Harry A. Estep,* for appellees, Nos. 16 and 17.

*J. Roy Dickie,* of *Dickie, Robinson & McCamey,* for appellee, Nos. 217 and 30.

OPINION BY MR. JUSTICE MAXEY, January 6, 1941:

An action in trespass was brought against defendants to recover damages resulting from injuries sustained by Mary Esther Farrelly, the minor plaintiff, when the automobile in which she was a guest collided with an electric pole on Saw Mill Run Boulevard (hereinafter referred to as the boulevard) near its junction with Noble's Lane.

At about 2:30 a. m. on September 24, 1935, the minor plaintiff was a passenger with four other guests in an automobile owned and operated by James T. Philpot, which while proceeding along the boulevard in a northerly direction at a speed of 20 or 25 miles per hour collided with an electric pole located on the east side of the highway at a point approximately 126 feet north of the Noble's Lane intersection. The driver kept to the east or right-hand edge of the northbound traffic lane, guiding himself by the "contour" of the concrete

and the west line of the "island" and though there was a "light fog" he "could see at least 30 or 40 feet." He testified further that he was "about five or six feet away when the pole loomed up in front of" him and that "the pole was completely black, a neutral color, blended with the road until the point when the lights picked it up," and that he "turned the car to the left to avoid it but struck the side of the car." All the occupants of the car received injuries as a result of this collision. The minor plaintiff was then nearly 19 years of age.

The pole involved in this accident was owned, maintained and used by the Duquesne Light Company, and it is the same pole which was collided against two and a half months later, giving rise to the claim for damages adjudicated in the case of Nelson v. these same defendants, and Robert Messinger, additional Defendant, reported in 338 Pa. 37, 12 A. 2d 299. The locus of this accident is fully described in that opinion and the legal principles applicable to this case are all set forth therein.

There was uncontradictory testimony that a 600 candlepower electric bulb was suspended from the pole in question, that there was also on the pole a red neon stop sign directed to traffic entering the boulevard from the north branch of Noble's Lane. There was conflicting evidence as to whether or not two highway route markers were attached to the pole and facing the traffic on the boulevard on the night in question.

By agreement of the parties a verdict was directed in favor of the County of Allegheny and the case was submitted to the jury against the remaining defendants, whose separate requests for binding instructions were refused. A verdict was rendered against them jointly in the sum of $5,500 in favor of the minor plaintiff and in the sum of $2,000 in favor of her mother and next friend. The court below granted the Standard Oil Company's motions for judgment n. o. v., calling attention to the fact that "the Supreme Court reached

the same conclusion as to this defendant in the Nelson Case [supra]." The motions of the City of Pittsburgh and the Duquesne Light Company for a new trial and for judgment n. o. v. were refused and judgment was entered against them. These appeals followed.

In view of our opinion in the Nelson case, supra, this record presents no case for the entry of judgment n. o. v. in favor of either of the appellants. The only questions requiring discussion are those which relate to the refusal to grant a new trial. The reason for a new trial which is pressed by the City of Pittsburgh is that the trial judge refused this defendant's eleventh request to charge the jury, reading as follows: "If the jury find any verdict against the City of Pittsburgh in this case, they must also find a verdict in favor of the City of Pittsburgh and against the Duquesne Light Company, in the same amount." In refusing that request, the learned trial judge correctly interpreted what we said in our opinion in the Nelson case (supra) as meaning that if it was not negligent in the first place for the light company to place and maintain the pole in the street, it could not be negligent for the city to permit it to be so maintained and that therefore a verdict against the city but not also against the light company would be an inconsistent verdict. We said in that case: ". . . while, if the facts warrant it, a sustainable verdict *could* be rendered against *both* the City and the Light Company, a sustainable verdict *could* not be rendered against the City if the Light Company is exculpated." In our opinion in that case we did not hold that the Duquesne Light Company could be held as "liable over" to the city because of this pole. The light company was in point of time the first tort-feasor in erecting the pole at that point; the city was in point of time the second tort-feasor in permitting that pole to remain at that point. The menace of that pole to northbound traffic should have been obvious to the city as soon as the paved portion of the highway was so

widened as to leave that pole almost in the center of the northbound traffic half of the highway. In the case of *Kost v. Ashland Borough,* 236 Pa. 164, 84 A. 691, cited by the City of Pittsburgh, as "followed" by us in the Nelson case, supra, the pole which fell and killed a child was at the side of a street and it fell into the street. This court said in that case: The pole "broke at or near the surface of the ground where it was much decayed, but the decay was from the inside and there was but little, if any, indication of decay on the surface of the pole." We there held that the duty to maintain the pole in a safe condition "primarily rested" upon the electric light company which erected it and that the duty of the city to inspect the pole was secondary. We said: The city's "duty in the case of its streets was not to seek for defects but to observe them when they became observable in the exercise of reasonable supervision" (citing *Lohr v. Philipsburg Boro.,* 156 Pa. 246, 27 A. 133). In the Kost case the danger was hidden in the condition of the pole itself, the primary duty to maintain which in *a safe condition* rested upon the company which erected and used it. In the instant case (as in the Nelson case) the danger was *not* in the *condition* of the pole but in its *location,* and *for that* the city was as much responsible for *permitting it to be there* as the light company was for *placing* it there. The trial judge correctly charged the jury as to the law applicable to this case and also as to the facts. Therefore, there is nothing assigned for error which calls for the granting of a new trial to the City of Pittsburgh.

The chief complaint of the Duquesne Light Company is that it was error to enter judgment n. o. v. in favor of the Standard Oil Company of Pennsylvania alone. (The Light Company says in its brief: "The charge of the court was on the whole eminently adequate and fair.") The learned court below in its opinion refusing the motions for a new trial and for judgment n. o. v. in favor of the present appellants, fully justified its

entry of judgment n. o. v. in favor of the Standard Oil Company. That opinion well says: "It [the Standard Oil Company] did not erect or own the pole, and it had no power or authority to remove it from its unsafe location. The mere fact that in 1930, five years before this accident occurred, it took the initiative in asking the Light Company to relocate the pole, and that it then paved the twenty-foot right-of-way from its property to the old highway, created no right or duty on its part to abate the obstruction or police the safety of the public road. Before the boulevard was widened south of the gasoline station in 1935, there is no evidence that any accidents were caused by the Oil Company's extension of the paving. There is no allegation or proof that the right of way between the station and the old cartway was paved in an improper or negligent manner. This defendant had the right to secure for itself a means of access to the road, and until the boulevard was widened by the highway department the situation was apparently not dangerous. Furthermore, it was the position of the pole, and not the pavement, that created the danger."

Both appellants complain of the excessiveness of the verdicts. The medical testimony shows that the minor plaintiff sustained in the collision "a fracture of the skull leading from the mastoid region on the right side back of the ear up into the orbit where the eye socket fits. She had another fracture on the left leading from the mastoid about four inches frontwards; had a fracture of the malar bone, right side, right below the eye; one end of this extended into the orbit and the other end extended downward. Back further she had a fracture of the zygoma, this bone that leads across in front of the ear, and this extended into the glenoid cavity, where the jawbone articulates. She had a fracture of the second, third, fourth, fifth and seventh ribs on the right side near the spine. . . . Both knees were bruised." The seriousness and extent of these injuries

fully warranted the verdict of $5,500 rendered in her behalf.

Neither was the verdict in behalf of the mother for $2,000 excessive. At the time of the accident the minor plaintiff was eighteen years and ten months old. She was earning at the time $15.00 a week. She was incapacitated for almost two years though she made several attempts during that period to resume work. After finding it physically impossible (after brief trials in different stores) for her to resume permanent employment, she testified that she went home and rested for "about twelve months." During that time she said she "had had illnesses and was sick and weak and run down." The substance of her testimony was that for a period of two years she worked for about three months. The mother paid hospital and doctor's bills amounting to $364.00.

The judgments are affirmed.